## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

LESIA A. ROSE,                              )

      PLAINTIFF,                      )

VS.                                         )                  **2:13-cv-1080-JHH**

WAL-MART STORES EAST,                       )
INC.,
                           )
      DEFENDANT.

## MEMORANDUM OPINION

The court has before it the Motion (Doc. #27) for Summary Judgment filed by

Defendant Wal-Mart Stores East, Inc. ("Walmart") on December 29, 2014.  Pursuant

to the court's order of January 5, 2015 (Doc. #30), the motion for summary judgment

is now under submission and is considered herein without oral argument.

Having considered the briefs and evidentiary submissions, the court finds that

Walmart's motion for summary judgment is due to be granted for the reasons outlined

below.

## I.    <u>Procedural History</u>

Plaintiff Lesia A. Rose commenced this action on June 6, 2013 by filing a

single count complaint for "retaliation" in violation of 42 U.S.C. § 2000e *et seq.* and

42 U.S.C. § 1981.  Specifically, Plaintiff asserts in her complaint that she was

subjected to racially motivated termination, "as she was terminated in retaliation for

having made race based EEOC complaints under Title VII of the Civil Rights Act of 1964." (Compl., ¶ 17).

Defendant's December 29, 2014 Motion (Doc. #27) for Summary Judgment asserts that no genuine issue of material fact exists and that Walmart is entitled to judgment as a matter of law as to all claims asserted against it.

The parties have each filed briefs and submitted evidence in support of their respective positions concerning the pending motion for summary judgment. On December 29, 2014, Walmart submitted evidence[1] (Doc. #29, Exhs. A-E) in support of the motion and also filed a supporting memorandum brief (Doc. #28). Plaintiff filed a Response (Doc. #33) in Opposition to Defendant's Motion for Summary Judgment on February 9, 2015. On February 17, 2015, Walmart filed a Reply (Doc. #34) in Support of its Motion for Summary Judgment.

---

[1] Defendant Walmart submitted: the deposition transcript of Lesia Rose, including exhibits (Exhibit A); the deposition transcript of Charles "Glenn" Smith, including exhibits (Exhibit B); the declaration of Glenn Smith, including exhibits (Exhibit C); the declaration of Cedrickia Towns (Exhibit D); and Plaintiff's Responses to Requests for Admissions (Exhibit E).

## II.   Legal Standards for Evaluating a Summary Judgment Motion[2]

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323.   Once the moving party has met her burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.

---

[2]   Federal Rule of Civil Procedure 56 was amended on December 1, 2010.   However, even with the 2010 amendments, "the standard for granting summary judgment remains unchanged."   FED. R. CIV. P. 56 Advisory Committee's Note (2010 Amendments).

1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.

The method used by the party moving for summary judgment to discharge her initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, she can satisfy her initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with

4

positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets her initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  *Chapman v. AI Transport*, 229 F.3d 1012,

1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   <u>Relevant Undisputed Facts</u>[3]

### A.   **Plaintiff's Employment History with Walmart**

Plaintiff Lesia Rose was hired as a Bay Technician at Walmart Store #2111 in Hoover, Alabama.  (Rose Dep. at 62-63).  As a Bay Technician, Rose worked in the Tire, Lube, and Express ("TLE") Department, which provides automotive care to customers.  (Rose Dep. at 62-63).  In or around 2002 or 2003, Rose was promoted to the position of Service Writer in the TLE Department.  (Rose Dep. at 64-65).  Rose remained a Service Writer for approximately three years until she asked to make the lateral move to TLE cashier, a position she held until the termination of her employment with Walmart in 2011.  (Rose Dep. at 66-67).  As a TLE Cashier, Rose was responsible for answering telephones, cleaning and running the register, stocking merchandise, ordering special materials for management, cleaning the service area, training new technicians, training new managers of the department, and customer care.  (Rose Dep. at 67).

---

[3]  If the facts are in dispute, they are stated in the manner most favorable to the Plaintiff. *Fitzpatrick*, 2 F.3d at 1115.

In her role as TLE Cashier, Rose reported directly to TLE Department Manager Christopher Henderson (Caucasian) and to Cedrickia Towns (African-American), the Assistant Manager responsible for TLE.  (Rose Dep. At 68-69).  Glenn Smith (Caucasian) became the Store Manager of Store #2111 in 2000, and was Plaintiff's manager for the majority of her employment.  (Smith Dep. at 14).

**B.     Rose's Complaints of Discrimination**

Walmart has an Open Door Policy which is put in place for associates to express concerns of any type.  (Smith Decl. ¶ 10; Rose Dep. at 93).  Rose was aware of, and utilized, the Open Door Policy; she made Open Door Policy complaints about the removal of a cordless phone, the ban of a heater at her work station, and the theft of a magnet off of her car.  (Rose Dep. at 99-103, 110-113).  Rose also used other avenues to express concerns about Walmart.  She complained: internally to Walmart store management; to Walmart's home office (including the Board of Directors, President and CEO, and regional human resource officials) twelve times; to the Birmingham and Hoover Police Departments; to OSHA; to Alabama State Representatives Juandalynn Givan and John Rogers; to Alabama Attorney General Luther Strange; to Alabama Governor Dr. Robert Bentley; to the ACLU; to the NAACP; to United States Senator Jeff Sessions; and to Karen Church of Fox 6 News. (Rose Dep. at 107-120, 250-252, 261-263, 266-267).

7

Rose filed ten Charges of Discrimination against Walmart with the EEOC.[4]

(Rose Dep. at 59-60, 107). Two of those Charges, filed on February 10, 2012 and

amended on May 10, 2012, form the basis of the lawsuit currently before this court.[5]

## C.    Events Leading to the Termination of Rose's Employment

On November 29, 2011, Assistant Manager Cedrickia Towns (African-

American), who oversaw the TLE Department and was familiar with Rose's normal

work schedule, arrived at work at 8:00 a.m., the same time as Rose. (Towns Decl.,

¶ 5). Mr. Towns thought it was odd that Rose arrived at 8:00 a.m. because her normal

start time was 7:30 a.m. (Towns Decl., ¶ 5; Rose Dep. at 144). Mr. Towns later

reviewed the time clock punches and discovered that Rose has used Walmart's

electronic Wire to alter her arrival time.[6] (Towns Decl., ¶ 5). Although Rose actually

---

[4] On May 17, 2011 Rose filed, *pro se*, a lawsuit in the Northern District of Alabama against Walmart Store #2111 alleging discrimination in employment. On May 20, 2011 Rose filed a second lawsuit against Walmart Store #2111. Both cases were consolidated into one by United States District Judge R. David Proctor. On December 15, 2011 the court dismissed both of Rose's claims without prejudice for failure to state a claim and for want of prosecution.

[5] The EEOC issued Notices of Right to Sue on March 13, 2013 for both Charges. (Doc. #1, Exhs. A, B).

[6] Walmart associates use the company's Intranet, also known as the "Wire," for a number of purposes. (Smith Decl., ¶¶ 4, 5). Among the tasks that an associate may accomplish on the Wire is Electronic Time Adjustment. (Smith Decl., ¶ 5). Occasionally, associates need to manually adjust their clock-in or clock-out times, such as when the associate forgets to clock in or out. (Smith Dep. at 25-26; Towns Decl., ¶ 4). An associate must use her unique User ID and password to gain access to the Wire and once there can only make changes for herself. (Smith Decl., ¶ 5). When an associate logs into the Electronic Time Adjustment & Time Off Main Menu, there are several options and, at the bottom of the screen, a warning that reads: "The falsification of, or failure to record complete and accurate time records, is a violation of company

clocked in at 8:01 a.m., she had adjusted the time clock to show her arrival time to be 7:35 a.m. (Towns Decl., ¶ 5). Upon recognition of the time adjustment, Mr. Towns took the issue to Mr. Smith (Caucasian Store Manager). (Towns Decl., ¶ 6; Smith Decl., ¶ 4; Smith Dep. at 50-55).

Mr. Smith contacted Store #2111's in-house Asset Protection Department for assistance, asking associate Alex Moore to review videotapes *and* time clock punches for Rose for a one-week period. (Smith Dep. at 56-57; Smith Decl., ¶ 4). Mr. Smith reviewed the videotapes with Mr. Moore and together they made the following findings:

• On November 29, 2011, the day Mr. Towns reported Rose's time adjustment, Rose drove into the parking lot of Store #2111 at 7:57 a.m., entering the store at 7:59 a.m., and clocking in at 8:01 a.m. The Wire revealed that Rose had manually adjusted that time punch, changing it to show an arrival time of 7:35 a.m. (Smith Decl., ¶ 6; Rose Dep. at 136).

• On November 28, 2011, Rose made a similar time adjustment through the Wire. She originally clocked in at 7:50 a.m., then changed her time to show an arrival time of 7:35 a.m. (Smith Decl., ¶ 7).

---

policy and can lead to disciplinary action, up to and including termination." (Exh. 6 to Pl. Dep.; Smith Decl., ¶ 5). This warning appears each time the associate logs in to the Electronic Time Adjustment & Time Off Menu. (Smith Decl., ¶ 5).

- On November 30, 2011, Rose actually clocked in at 7:47 a.m., then manually adjusted her time to show an arrival at 7:36 a.m.  (Smith Decl., ¶ 7).

- On December 2, 2011, Rose actually clocked in at 7:53 a.m., then manually adjusted her time to show an arrival at 7:41 a.m.  (Smith Decl., ¶ 7).

These adjustments amounted to sixty-five (65) minutes of adjusted time.  (Doc. #33 at 5).

Mr. Smith and Shift Manager Jennifer Rimes met with Rose on December 2, 2011 to discuss the investigation.  (Smith Dep. at 57-60; Smith Decl., ¶ 8).  Rose admitted that she had adjusted her arrival time due to traffic, writing in a statement: "My reasons for time adjustments was due to extreme traffic issues coming to work on 65-South coming on to Hwy 280, the construction as well as accidents have caused my delay."[7]  (Exh. 7 to Pl. Dep.).  Rose expressed to Mr. Smith that it was not her intent to steal time from Walmart as she often worked over after having clocked out if it served Walmart's needs.  (Rose Dep. at 199).

---

[7] When asked at her deposition whether she thought Walmart should pay her for time she was stuck in traffic, Rose answered: "I will say yes."  (Rose Dep. at 147).  She further admitted that she was not performing any work for Walmart during the time that she was sitting in traffic. (Rose Dep. at 150).  Rose also argued in her deposition that she made the changes to compensate for "my breaks I did not get," referring to the paid 15 minute break periods that Walmart provides its associates during each shift.  (Rose Dep. at 148, 170-172).  As such Rose's argument is that she was entitled to be paid twice when she did not receive one or more of her 15 minute breaks.  (Rose Dep. at 170-172).

Based on his review of the videotapes and time clock records, as well as his discussion with Rose, Mr. Smith concluded that Rose had violated company policy by lying about her arrival time on the company's time clock records. (Smith Decl., ¶ 9). Mr. Smith considered what Rose had done to be gross misconduct.[8] (Smith Dep. at 21). Therefore, on December 20, 2011 Mr. Smith met with Rose and informed her of his decision to terminate her employment with Walmart for falsification of company time records. (Rose Dep. at 172-177; Smith Decl., ¶ 11).

## IV.   Argument and Substantive Analysis

### A.   Race Discrimination

Plaintiff's Complaint arguably asserts a claim for race discrimination in its single count titled "RETALIATION IN VIOLATION OF 42 U.S.C. § 2000e, *et seq*.,

---

[8] Walmart's "Gross Misconduct" policy, in relevant part, reads as follows:

Gross misconduct will not be tolerated. Coaching for Improvement will not be used to address gross misconduct. The employment of an Associate who is deemed to have engaged in gross misconduct is subject to immediate termination. Associates terminated for gross misconduct are not eligible for re-hire. The following list is not all-inclusive but serves as examples of conduct; which are usually classified as gross misconduct and may result in immediate termination:

- Intentional misuse of Company time (claiming pay for time not worked)
- Theft
- Dishonestly/Compromised Integrity
- Fraud
- Abuse of Associate Discount
- Grazing (i.e. opening packages, purposefully damaging items, removing items from the shelf to eat, or any other act which causes a financial loss to the Company).

(Doc. #29, Exh. 4 at 56-57).

AND 42 U.S.C. § 1981." (*See generally* Doc. #1).  Although Walmart argued for summary judgment as to any race discrimination claim, Plaintiff's opposition brief does not address any race discrimination claim.  (*See generally* Doc. #33).  Therefore, to the extent Plaintiff intended to assert a claim for race discrimination, such claim is due to be, and hereby is, **DISMISSED WITH PREJUDICE**.

### B.    Retaliation

Plaintiff alleges that the termination of her employment from Walmart was racially motivated, "as she was terminated in retaliation for having made race based EEOC complaints under Title VII of the Civil Rights Act of 1964."  (Compl. ¶ 17).

In analyzing the merits of this claim, the court must apply the familiar *McDonnell Douglas* burden shifting analysis.[9]  *See Baker v. Russell Corp.*, 372 Fed. Appx. 917, 919 (11th Cir. April 12, 2010) (citing *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009), *cert. denied*, – S. Ct. – (U.S. Feb. 22, 2010) ("We apply the *McDonnell Douglas* framework when analyzing claims of retaliation brought under . . . Title VII . . .")). Anti-retaliation provisions prohibit an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice," including discrimination on the basis of race.  42 U.S.C. §

---

[9]  Plaintiff concedes that this is a circumstantial evidence case.  (*See* Doc. #33 at 10-11) (analyzing the claim under the framework for a circumstantial evidence case).

2000e-3(a).   The goal of these provisions is to "prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," including freedom from race discrimination.  *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53 (2006). "An employee need not prove the underlying claim of discrimination for the retaliation claim to succeed." *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999) (citations omitted).

To establish a *prima facie* case of retaliation, Plaintiff must show: (1) she engaged in protected activity or expression; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally connected to the protected conduct.  *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998); *see also Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).  If Rose is able to advance a *prima facie* case of retaliation, the burden then shifts in accordance with *McDonnell Douglas* to Walmart to articulate legitimate, non-discriminatory reasons for the alleged retaliatory acts. *See Holifield*, 115 F.3d at 1566.  Upon the employer's successful articulation, for a claim to survive summary judgment, Plaintiff must demonstrate that the employer's proffered explanation operates as a pretextual ruse for retaliation.  *See Farley v.*

13

*Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (citation and internal quotation omitted).

### 1.    The *Prima Facie* Case of Retaliation Fails.

Walmart concedes that Plaintiff's EEOC Charges and resultant lawsuits constitute protected activity and that her employment termination was an adverse action. (*See* Doc. #28 at 14).  However, the company argues that Rose cannot meet the *prima facie* case because there is no causal link between Rose's protected activities and her termination for falsification of company records. (*See* Doc. #28 at 14).  "In order to establish the requisite 'causal link' required as part of a *prima facie* case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'" *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  A substantial delay between the protected activity and the negative employment action, where there is no other evidence of causation, is insufficient to establish a causal connection.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  Moreover, a causal relationship must be established through evidence that the "desire to retaliate" against the protected expression was the "but-for cause" of the adverse action.  *Ambus v. AutoZoners, LLC*, at *14 (M.D. Ala. Dec. 29, 2014).

Rose seems to allege that she engaged in protected activity when she filed "numerous EEOC charges" and complained of discrimination in two lawsuits filed in 2011. (*See* Doc. #33 at 12). She argues that there is a causal connection between those protected acts and the termination of her employment on December 20, 2011. (*See* Doc. #33 at 11-12) ("Roses's evidence of causation are the indisputable facts that Mr. Smith [the decision maker] was well aware of her protected activity and that he treated her more harshly than others who committed nearly identical acts of dishonesty."). The problems for Rose with this line of argument are multifold. Mr. Smith was indeed aware of Rose's protected activities since April 24, 2009. (*See* Doc. #33 at 12). The last protected activity Plaintiff specifically mentions is her filing of a federal lawsuit against Walmart on May 20, 2011, seven months prior to the termination of her employment. Of course, events so far removed from the termination decision are entirely too tenuous to support causation. *See Higdon v. Jackson*, 393 F.2d 1211, 1220 (11th Cir. 2004) (noting that the Supreme Court cited with approval cases stating that a 3 to 4 month disparity between the activity and the adverse action was insufficient to find a causal connection); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361 (11th Cir. 2007) ("In opposing summary judgment, [plaintiff] failed to present evidence from which a reasonable jury could find any causal connection between her . . . complaints of sexual harassment and the

termination of her employment three (3) months later."). And though Rose seems to suggest that the *dismissal* of her race discrimination lawsuit by Judge Proctor on December 15, 2011 establishes the requisite causal connection to the termination of her employment, (*see* Doc. #33 at 4-5) ("Mr. Smith was also aware that Judge Proctor had dismissed Rose's aforementioned lawsuits."), the court is aware of no case law that would support such a contention (and indeed Plaintiff cites to none).[10] Quite to the contrary, case law suggests that finding the *dismissal* of a lawsuit to be a protected activity would eviscerate the causal-connection requirement that "mere temporal proximity, without more, must be 'very close.'" *Gray v. City of Montgomery*, 756 F. Supp.2d 1339, 1350-1351 (M.D. Ala. 2010) (*citing Thomas*, 506 F.3d at 1364):

> [Plaintiff] has failed to explain why, for an adverse action that occurred perhaps years after a lawsuit or complaint was filed, the inference of discrimination should apply just because the lawsuit was still pending [or recently dismissed]. It can be reasonably assumed that a defendant would be angry upon first learning that a lawsuit charging racial discrimination had been filed against him and that any adverse action taken against the filer immediately after the filing is tied to that anger; however, the tie is too attenuated and the assumption has no reasonable basis when the adverse action comes years, or even many years, later.

---

[10] Although Plaintiff attempts to make much of the fact that her time adjustments were noted on December 2, 2011 and that her employment was not terminated until December 20, 2011, the evidence is undisputed that during this 18 day period, Mr. Smith was passing along information to HR and awaiting word on the proper course of action. (*See* Doc. #34 at 5-6, n.2).

> Second, if the court were to accept [Plaintiff's] argument, it would follow that not only a lawsuit but an EEOC charge (or for that matter any and all internal administrative complaints) would constitute a continuing protected activity, with the result that, for all adverse actions taken while the charge or complaint was pending, the causal-connection requirement would be satisfied. [Plaintiff's] argument would then essentially eviscerate, in those instances where a lawsuit or complaint was the protected activity, the whole causal-connection requirement that "mere temporal proximity, without more, must be 'very close.' " *Thomas*, 506 F.3d at 1364 (*citing Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)).

Even Rose understands that temporal proximity is lacking "if Rose were only depending on evidence of temporal proximity to establish her *prima facie* case." (Doc. #33 at 11).  She proceeds on two separate theories to link the *prima facie* case.

First, Rose argues that "a causal connection can be shown if a plaintiff-employee presents evidence that, after the employer learned of the EEOC charge, the employer treated the employee differently from similarly-situated non-protesting employees" (Doc. #33 at 12-13) (*quoting Williams v. Hager Hinge Co.*, 916 F. Supp. 1163, 1177 (M.D. Ala. 1995)).  Rose attempts to shore up her case by "identif[ying] fourteen other employees who committed various dishonest acts as defined by Defendant's own policies who were not terminated." (Doc. #33 at 7, 12).  Of those fourteen employees mentioned, the infractions that did not lead to termination of employment were: understocking merchandise; excessively marking down merchandise; shopping on company time; purchasing understocked merchandise;

17

stealing company time; and hiding damaged merchandise. (*See* Doc. #33 at 9-10).

Of course, only the individual counseled for stealing company time is potentially

"similarly situated" to Rose. Bethany Durbin "admitted to stealing time from the

company on more than one occasion, just like Rose, but was not terminated or even

harshly disciplined. The only difference is that Rose had engaged in protected

conduct while Durbin had not." (Doc. #33 at 12). But while Rose makes this broad

statement, she has failed to demonstrate that she and Durbin are similarly situated in

all respects, as is her burden. *See Adams v. Housing Auth. of the City of Bessemer*,

No. 2:13cv1993, 2015 U.S. Dist. LEXIS 6584, *11-12 (N.D. Ala. Jan. 21, 2015). In

fact, though Rose paints Durbin's infraction with a broad brush, Durbin was

disciplined not for falsifying time records, but for shopping while on the clock and

spending too much time in the smoker's lounge. (*See* Doc. #34 at 7-8; Rose Dep. at

172-177, Exhs. 8, 12). This "theft of company time" is different in nature than Rose's

"theft of company time." (*See* Smith Dep. at 99, 107-108) (testifying that taking a

long break is not technically stealing time and that "goofing off" very rarely goes

straight to termination). Moreover, different decision makers were involved in the

Rose and Durbin infractions. *See Dejarnett v. Willis*, 976 F. Supp.2d 1271, 1286

(M.D. Ala. 2013) ("Differences in 'treatment by different supervisors or decision

makers can seldom be the basis for a viable claim of discrimination.'") (*citing Silvera*

*v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001)).  Because the infractions are not "nearly identical," this court cannot sit as a super-personnel department and second-guess Walmart's business judgment for treating different infractions in different ways.  *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997); *see also Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2001) (en banc).

Rose's alternative argument is that the "first opportunity to retaliate" doctrine should be applied in this case.  (*See* Doc. #33 at 14-19).  The "first opportunity to retaliate" doctrine allows a plaintiff to prove the causation element of a retaliation claim – despite a temporal gap sufficient to prevent a finding that the protected activity and the retaliatory conduct have some causal connection – if the plaintiff can show that the defendant had no earlier opportunity to retaliate and that the evidence shows the events are not completely unrelated.  (*See* Doc. #33 at 14-19).  While this is an accurate description of the law, in all of the cases cited by Plaintiff there was an absence – either by the plaintiff or the supervisor – that delayed the employer's ability to retaliate.  *See, e.g., Pelham v. City of Daphne*, 2013 WL 2368042 (S.D. Ala. May 29, 2013) (finding that eleven month gap between Plaintiff's protected, post-termination conduct and her application with another employer that sought her personnel information did not preclude a finding of retaliation because Plaintiff's

application was prior employer's first opportunity to retaliate); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d. Cir. 2013) (finding that four month gap between Plaintiff's alleged complaint of harassment and the denial of a college football managerial position for the Spring was sufficient to establish causation because Plaintiff, logically, did not work with the football staff between her November complaint and the start of the Spring training season). Here, Walmart had every opportunity to retaliate against Rose at every turn. There was no change in leadership or job assignments that would have precluded Store Manager Smith or TLE Assistant Manager Towns from retaliating against Rose has they so desired. (*See* Doc. #33 at 3). In fact, Rose worked for Walmart for nearly ten years, and despite her complaints through multiple avenues, the company continued to employ her until she committed these documented acts of dishonesty.

Because Rose has failed to establish a causal connection between any protected activity and the adverse action of Walmart, her claim of retaliation fails.

### 2. Walmart has Presented Legitimate, Non-Discriminatory Reasons for Rose's Termination.

Even assuming, *arguendo*, that Rose had successfully established a *prima facie* case of retaliation, her claim would nevertheless fail to survive summary judgment. Walmart articulates that Rose's employment was terminated because Rose altered her time records to indicate that she was at work when, in fact, she was sitting in traffic.

(*See* Doc. #28 at 17; *see also* Doc. #33 at 19).  Rose does not dispute this misconduct. *See Crawford v. Chao*, 158 Fed. Appx. 216, *219 (11th Cir. 2005) (finding falsification of a time record was a legitimate, non-discriminatory reason).  As such, the presumption of retaliation is rebutted, and Rose bears the burden to produce evidence that this alleged reason for termination is nothing but a pretext for illegal discrimination.  *See Wilson*, 376 F.3d at 1085.

This Rose has failed to do.  She points to "at least fourteen other employees [who were] spar[ed] the ultimate sanction of termination," (Doc. #33 at 19-20), but as has heretofore been analyzed, those employees were not similarly situated to Rose. (*See* discussion *supra*).  Rose cannot identify any other associate who lied about her arrival time to compensate for being stuck in traffic.  There is simply no evidence that Walmart's reason for termination was untrue or that the real reason for the termination was discrimination.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

For this separate and additional reason, Walmart's Motion (Doc. #27) for Summary Judgment is due to be granted.

## V.      Conclusion

For the reasons outlined above, Defendant Walmart Stores East, LP's Motion

(Doc. #27) is due to be granted.  A separate order will be entered dismissing this case

in its entirety.

**DONE** this the ___23rd___ day of March, 2015.

_James H. Hancock_
_____

SENIOR UNITED STATES DISTRICT JUDGE